LAWRENCE ANDERSON *et al.*, Plaintiffs-Appellants, *v.* FARMERS HYBRID COMPANIES, INC., *et al.*, Defendants-Appellees.

Third District    No. 79-274

Opinion filed August 14, 1980.

Watts C. Johnson, of Johnson, Martin & Russell, of Princeton, and Philip E. Koenig, of White & Koenig, of Geneseo, for appellants.

R. J. Lannon, Jr., and Douglas A. Gift, both of Herbolsheimer, Lannon, Henson & Duncan, P. C., of La Salle, for appellees.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

Plaintiffs, Lawrence and Richard Anderson, appeal from the judgment of the Circuit Court of Bureau County granting the motions of

defendants, Farmers Hybrid Companies and Monsanto Agricultural Products Companies (hereinafter Farmers Hybrid), to dismiss and strike plaintiffs' seven-count complaint. The complaint sought recovery of damages from Farmers Hybrid as a result of its sale to the Andersons of allegedly defective gilts. (Gilts are unbred female pigs used for breeding purposes.)

In 1972 the Andersons purchased 11 gilts from Farmers Hybrid. Shortly after receiving the gilts, according to the allegations of the complaint, the Andersons discovered that the gilts had a contagious and infectious disease called "bloody dysentery." As a result of contact with the diseased gilts, the Andersons' own swine herd suffered considerable damage and the Andersons were put to the expense of treatments for the disease. They brought this action to recover for the damages suffered.

Count I of the complaint sounded in strict tort liability; counts II and III were based upon implied sales warranties; counts IV and V were based upon statutory liability (Ill. Rev. Stat. 1971, ch. 8, par. 191); counts VI and VII were premised upon negligence and willful and wanton misconduct. The trial court, on the defense motions to dismiss and strike the complaint, dismissed plaintiffs' action. In so acting, the court concluded that strict products liability had not been extended to living things, such as the gilts. The court also found that the warranties had been disclaimed in the contract, and it held that the plaintiffs were not in the class of persons for which the statutory protection was intended to apply. The negligence counts were dismissed on the basis of the court's finding that the plaintiffs had failed to plead compliance with a condition precedent in the contract, i.e., to give notice of claims within 30 days from delivery of the gilts. The court also held that the failure to plead the condition precedent, written notice of claim within 30 days, would also bar all the other claims asserted, even if they were otherwise applicable. From the judgment dismissing the complaint and from the rulings on each count, the Andersons appeal.

The record in the instant case reveals the following facts, as found in the allegations of the plaintiffs' complaint, which for purposes of the motion to dismiss are to be taken as true. On September 11, 1972, Lawrence and Richard Anderson ordered, by telephone, 11 gilts from Farmers Hybrid. Shortly thereafter the Andersons received from Farmers Hybrid an "order confirmation slip." The 4- by 7-inch slip of paper contained on its front side information confirming the name of the purchaser, his address and directions to the farm. It also specified the breeding date and the delivery date, along with the amount of deposit, and it was signed by company officials. It confirmed the order made by telephone. It also contained, in small print, a statement that "This order is subject to conditions on reverse side hereof and subject to acceptance by

the Company." The reverse side of the slip contained the following paragraph:

"WARRANTY AND LIMIT OF LIABILITY

Farmers Hybrid warrants title and that all gilts delivered by it have met Federal and State cholera regulations, have been vaccinated for erysipelas and three forms of leptospirosis (Pomona, ictero-hemorrhagica and Canicola), have reacted negatively to tests for brucelosis, are basically structurally sound animals with 12 functional nipples and are open gilts. Subject to the preceding sentence, Farmers Hybrid MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AS TO MERCHANTABILITY, FITNESS FOR PARTICULAR PURPOSE OR ANY OTHER MATTER WITH RESPECT TO THE GILTS. All claims with respect to gilts shall be deemed waived unless made in writing and received by Farmers Hybrid within 30 days after delivery. Buyer's exclusive remedy for any clause shall be for damage subject however, to Buyer's agreement that for any and all losses or damages resulting from any cause whatsoever, Sellers liability shall in no event exceed the purchase price of the gilt or gilts with respect to which damages are alleged. In no event shall Seller be liable for incidental or consequential damages."

On October 6, 1972, Farmers Hybrid delivered the 11 gilts to the Andersons' farm. At the time of delivery some or all of the gilts, according to the complaint, had a contagious and infectious disease called bloody dysentery. Twelve days after delivery of the gilts, the Andersons contacted Farmers Hybrid by telephone and informed the company of the diseased condition of the gilts. In response to the Andersons' call and the problem with the gilts, a veterinarian hired by Farmers Hybrid gave the Andersons advice on how to cure the disease, and he had a fecal sample taken for laboratory analysis. On the 20th of October, the veterinarian, on behalf of Farmers Hybrid, sent the Andersons a letter in which he outlined steps to be taken to control the "gilt problem" and in which he discussed the possible cause of the bloody dysentery. He also informed the Andersons that a fecal sample was being sent to the lab and that a report would be sent to them and to Farmers Hybrid. He closed the letter with: "If we can be of any further service to you, please feel free to call Farmers Hybrid."

According to the allegations in the complaint, as a result of the diseased condition of the gilts, a number of other pigs owned by the Andersons contracted the disease and died as a result. The Andersons filed suit in October 1976, seeking damages for the loss of their swine herd

and for the time and expense put into the treatment of the diseased pigs. A seven-count amended complaint was thereafter filed in September 1977, including counts based on strict tort liability, upon breach of implied warranties, upon statutory liability, and upon negligence and willful and wanton conduct. The defense motions to dismiss the various counts were granted by the trial court. From that dismissal of all counts of their complaint, the plaintiffs appeal.

The first issue we address concerns the application and validity of the condition precedent, which the court found to bar any recovery from Farmers Hybrid by the Andersons. As already noted, the reverse side of the order confirming slip contained a clause providing that all claims with respect to the gilts "shall be deemed waived unless made in writing within 30 days of delivery." No written claims were made to Farmers Hybrid within the 30-day period, and the Andersons did not plead compliance with the condition precedent under any of their theories of recovery. The trial court held that the condition precedent, acting as a limitation of liability, was valid and that plaintiffs' failure to plead compliance therewith barred all of their claims, whether sounding in contract, tort, strict liability or statutory liability. The Andersons alleged in their complaint, and again argue to this court, that Farmers Hybrid waived strict compliance with the terms of the condition precedent by their actions in responding to plaintiffs' complaints about the diseased gilts. We agree.

■■■ It is established that a person, by his actions and conduct, can waive strict compliance with the terms of a contract by the other contracting party. (See *Bartels v. Denler* (1975), 30 Ill. App. 3d 499, 333 N.E.2d 640.) Whether such a waiver has occurred must be judged by the facts and circumstances involved in the individual case. In the case at bar the Andersons, within 12 days of delivery of the gilts, telephoned Farmers Hybrid about the diseased condition of the gilts. It is noted that the Andersons' initial order was also by telephone. Through that telephone call, Farmers Hybrid, within the 30-day period set in the contract, had notice that there was a problem with the gilts they had delivered and that the Andersons were looking to them, as suppliers, to rectify the problem. Thus, a basic purpose of the short notice requirement, which by itself is understandable with live animals, was thereby satisfied.

Farmers Hybrid was promptly apprised of a problem with the gilts and the nature of the problem. Farmers Hybrid's response was not to request that the Andersons send a written confirmation note about the problem, nor was it to ask that they otherwise give written notice. Instead they responded by offering their assistance in dealing with the problem. A veterinarian hired by Farmers Hybrid looked into the matter. He offered specific advice to the Andersons on how to address the problem and took

samples for laboratory analysis. This was done on behalf of Farmers Hybrid in response to the Andersons' complaint. In addition, the veterinarian, within the 30-day period after delivery, wrote to the Andersons about their "gilt problem" and gave his advice for treatment. He also offered his further services on behalf of Farmers Hybrid. We find that these actions by Farmers Hybrid, in acknowledging the existence of the problem, in providing veterinary services for the Andersons, and in offering further assistance with the problem, operated to waive strict compliance with the 30-day written notice provision of the contract. The Andersons were fully justified in believing that no further claim or notice was required of them. They had promptly informed the company of the problem, and the company, by its response, had acknowledged the existence of the problem, and by implication, at least from the Andersons' perspective, had also acknowledged some responsibility and an intention to work out a solution of the problem. A written claim, as per the contract, would not have given the company any more information than what it had already received and what was available to it. In light of Farmers Hybrid's active response to the Andersons' complaint, any further notice could easily have been viewed as unnecessary by the Andersons. We conclude that Farmers Hybrid waived strict compliance with the 30-day condition precedent in the contract by its conduct in responding to the plaintiffs' oral complaint, which was made within the 30-day period.

This case must be distinguished from *Willis v. West Kentucky Feeder Pig Co.* (1971), 132 Ill. App. 2d 266, 265 N.E.2d 899, relied upon by Farmers Hybrid and discussed by the trial court. In *Willis*, the contract required that if the hogs became ill, a veterinarian must be contacted within seven days of delivery before the defendant would make settlement for the loss of the pigs. The plaintiff in that case did not comply at all with the condition precedent. No notice was received by the defendant company as would have been if the condition precedent had been complied with by the plaintiffs. However, subsequently the defendant seller did have its veterinarian examine the pigs and he did consult with the plaintiffs about the problems. The court found no evidence of waiver, noting and emphasizing that at the time of the proffered aid by the defendants, the plaintiffs had already failed to comply with the condition precedent. Since it was under no obligation to help, and since its liability was cut off by the failure of the plaintiffs to comply with the condition precedent, the court found that the defendants' cooperation could be attributed to customer relations and good will. (132 Ill. App. 2d 266, 272.) In the instant case, notice was given within the specified time period, albeit oral rather than written. Also, in the instant case, the time period for making claims and giving notice had not expired when the defendants responded with

their aid and cooperation. Therefore, since their liability even under the strict terms of the contract was still extant, such actions in offering assistance can not be merely dismissed as maintenance of customer relations and good will but manifested a desire to solve the problem. The *Willis* case is not controlling on these facts.

Having concluded that the Andersons' failure to plead compliance with the condition precedent did not warrant dismissal of the actions, we must now turn our attention to the other grounds upon which the dismissal of the various counts was based.

Accordingly, we turn to the question of whether the court properly dismissed that count of the complaint seeking recovery based upon strict tort liability. The trial court found that strict liability had not been extended to cover living things, as products, and it declined to apply the doctrine in the instant case. The plaintiffs argue for a broad, virtually unlimited, scope to the term "product" under strict tort liability actions, which would include living creatures as "products." Yet, living creatures are not part of the extensive list of products mentioned in the commentary to section 402A of the Restatement (Second) of Torts (1965); nor can the plaintiffs cite to any case which has held that living creatures, such as the gilts in this case, were a product for purposes of strict products liability law.

The question of the scope and substance of the term "product" as used in products liability law has received considerable discussion in recent decisions in this State. (*Lowrie v. City of Evanston* (1977), 50 Ill. App. 3d 376, 379-85, 365 N.E.2d 923; *Dubin v. Michael Reese Hospital & Medical Center* (1979), 74 Ill. App. 3d 932, 934-39, 393 N.E.2d 588.) No useful purpose would be served by our again reviewing the history and pertinent decisions on the question in this opinion, especially since the matter has received able, though inconclusive, treatment in those opinions. In the *Lowrie* opinion, after an extensive review of pertinent Illinois case law, of the Restatement and its commentary, and of the history and purposes of products liability, the court concludes:

> "we are of the belief that the policy reasons underlying the strict products liability concept should be considered in determining whether something is a product within the meaning of its use in the Restatement rather than * * * to focus on the dictionary definition of the word." (50 Ill. App. 3d 376, 383.)

The court there went on to conclude that neither an open-air multilevel garage nor a parking space in the garage were products within the meaning of section 402A. It based these conclusions upon the fact that buildings were not in the list of products set forth in the Restatement comments and upon the fact that there were other remedies available against those responsible for defective buildings. The court noted both

negligence and breach of warranty theories. (50 Ill. App. 3d 376, 384-85.) The *Dubin* case also discussed and reviewed pertinent case law and distinguished commentary in reaching its result that X-radiation, in the form of electricity, is a product for products liability law. (74 Ill. App. 3d 932, 942.) Both *Lowrie* and *Dubin* are useful in approaching the question of what is a product for purposes of section 402A. However, for our purposes, the case of *Whitmer v. Schneble* (1975), 29 Ill. App. 3d 659, 331 N.E.2d 115, mentioned in both *Lowrie* and *Dubin*, is more in point. In the *Whitmer* case, the court was faced with the question of whether the seller of a dog could be held liable under the products liability theory that he had sold an inherently dangerous product. The dog, subsequent to sale, bit someone. In concluding that the dog was not a product, the court there considered the Illinois Supreme Court opinions in *Cunningham v. MacNeal Memorial Hospital* (1970), 47 Ill. 2d 443, 266 N.E.2d 897, holding that blood is a product, and in *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, the landmark products liability case in Illinois. The court stated:

> "While a product need not be 'manufactured' and may be a viable thing, [citation], nevertheless, before the doctrine of *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, may be applied, its nature must be fixed when it leaves the manufacturer's or seller's control. And the product must reach the user without substantial change. [Citation.] The purpose of imposing strict liability is to insure that the costs of injuries resulting from defective products are borne by those who market such products rather than by the injured persons, who are powerless to protect themselves." (29 Ill. App. 3d 659, 663.)

The court concluded that the purpose of the imposition of strict liability would be defeated if products liability were to be applied to products whose character is easily susceptible to changes wrought by agencies and events outside the control of the seller, which is the case with living creatures. Similar considerations, emphasizing the changeable nature and health of living creatures, and the potential effect of events and conditions outside the control of the seller on such creatures, lead us to conclude that the trial court was correct in finding that the gilts at issue in this case are not products for purposes of imposing strict liability in tort under section 402A. While a "product" may be unchanged from its natural state, viable, and not the result of manufacturing processes, it must also be of a fixed nature at the time it leaves the seller's control. Thus, while blood or mushrooms, both sold in their natural state, may be products, their nature, as products, is fixed, or is intended to be fixed, prior to the time they enter the stream of commerce. If properly packaged, they are not easily affected by internal or external processes in the same way a living creature

is so affected. Living creatures, such as the swine in the instant case, are by their nature in a constant process of internal development and growth and they are also participants in a constant interaction with the environment around them as part of their development. Thus, living creatures have no fixed nature in the same sense as the blood or the mushrooms can be said to have a fixed nature at the time they enter the stream of commerce.

We find that the gilts in the instant case are not products within the meaning of section 402A. In reaching this result, we rely also upon the fact that nowhere in the commentary to section 402A are living things brought within the definition of "product," nor have the plaintiffs been able to cite us to any case from any jurisdiction which has held a living creature to be a "product." We would also note that excluding the swine from products liability law does not leave the purchasers without remedy. A purchaser of living animals has contractual remedies, including warranty protections, as well as tort remedies if the animals are "defective." Also, so far as swine are concerned, there exists statutory protection for persons injured by diseased swine. (See Ill. Rev. Stat. 1977, ch. 8, par. 191.) We shall return to that statutory section later on in the opinion. In conclusion on this issue, for the reasons above discussed, we find that the trial court did not err in dismissing count I of the Andersons' complaint, which sought to impose products liability upon the sale of the gilts by Farmers Hybrid.

■ Counts II and III sought recovery on the contract for breach of warranties, specifically for breaches of the warranty of merchantability and of the warranty of fitness for a particular purpose. (See Ill. Rev. Stat. 1971, ch. 26, pars. 2—314, 2—315.) The trial court dismissed those counts, holding that these warranties had been disclaimed in the contract, the order confirmation slip, between the parties. The Uniform Commercial Code does permit the parties to modify or alter these implied warranties, but it requires that any such disclaimer be in writing and that it be conspicuous. (Ill. Rev. Stat. 1971, ch. 26, par. 2—316(2).) The court found these requirements to be satisfied in the instant case. We do not. The Code defines "conspicuous" as follows:

> "A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is larger or other contrasting type or color. But in a telegram any stated term is 'conspicuous.' Whether a term or clause is 'conspicuous' or not is for decision by the court." (Ill. Rev. Stat. 1971, ch. 26, par. 1—201(10).)

The disclaimer of warranties in this case was in capital letters under a paragraph heading "Warranties and Limit of Liability," also in capitals.

However, the clause itself was on the back of the order confirmation slip sent by the defendants after the oral order had been placed. The front side of the slip, a 4- by 7-inch piece of paper, contained handwritten information concerning the buyer, his address, directions for delivery and dates for breeding and delivery. That side gave the appearance of being merely a standard order form without more. In small print, in the middle of the slip, was the following sentence: "This order subject to conditions on reverse side hereof and subject to acceptance by the company." This language was not conspicuous in any manner and, in fact, was in smaller print than other on the front side of the order slip. The language in capitals which sought to disclaim warranties was contained only on the reverse side of the order slip. We find little on the front side, under the circumstances, to bring to a reasonable person's attention and notice the existence of express disclaimers on the reverse side of the slip. Not only was the language in reference to conditions on the reverse side in small print, as noted, but also the general format and size of the order confirmation slip was of such an appearance that a person might reasonably conclude that there was little to the document, other than the statement of the order and delivery dates. In short, while the type used for disclaiming the warranties was conspicuous, in the sense of being larger than other type in the paragraph, the presence of that paragraph on the reverse side of the order slip was not at all conspicuous, either from the general appearance of the slip or from any conspicuous language on the front side of the slip. We find that the disclaimer of warranties on the reverse side of the order slip was not conspicuous so as to be valid under the Uniform Commercial Code. The trial court erred in dismissing the count based upon an implied warranty of merchantability.

We do affirm the dismissal of plaintiffs' theory of recovery based upon an implied warranty of fitness for a particular purpose. (Ill. Rev. Stat. 1971, ch. 26, par. 2—315.) This implied warranty applies where the seller has reason to know of a particular purpose for which the goods will be used and also that the buyer is relying upon the seller's skill or judgment to select suitable goods for that purpose. This particular warranty, as the Comments to this section of the Code indicate, applies where the goods are to be used for a particular purpose *other than* their ordinary use. Where the ordinary use is involved, then the warranty of merchantability is implicated. (See Ill. Ann. Stat. 1971, ch. 26, par. 2—315, and comments thereon (Smith-Hurd 1963).) In the instant case, the ordinary use of gilts is for breeding purposes and, therefore, the Andersons are limited to proceeding under their warranty of merchantability.

The final issue remaining on this appeal concerns the court's conclusion that the Andersons could not recover under the statutory liability imposed by section 24 of "An Act to revise the law in relation to

the suppression, prevention and extirpation of contagious and infectious diseases among animals" (Ill. Rev. Stat. 1971, ch. 8, par. 191). That section provides:

> "Any owner or person having charge of any swine and having knowledge of, or reasonable grounds to suspect the existence among them of, the disease known as 'hog cholera,' or of any other contagious or infectious disease and who does not use reasonable means to prevent the spread of such disease; or who conveys upon or along any public highway or other public grounds or any private lands, any diseased swine, or swine known to have died of, or been slaughtered on account of, any contagious or infectious disease, shall be liable in damages to the person or persons who may have suffered loss on account thereof."

The trial court concluded that the Andersons could not recover under this provision because the intent of the statute was to protect the general public, and not purchasers of swine who would have a remedy in contract against an owner or seller. The court concluded that the plaintiffs in the case at bar, as purchasers who consented to having the swine brought to their property, were not in the class for which the legislature intended the protection of the statute. We note, as did the trial court, that there are no cases specifically discussing this aspect of the statute. We also note that the plain language of the statute does not indicate any exception to liability in the situation where the injured party is in privity of contract with the owner of the diseased swine. As we noted in *Streator Township v. County Board of School Trustees* (1957), 14 Ill. App. 2d 251, 144 N.E.2d 531, and has been oft stated since, where the language is plain and unambiguous, and where the intention of the legislature is evident and plain from the language used, then a court must give the plain meaning to that language and not, in the guise of judicial construction, give a new meaning to the statute. Here the language of the statute is plain and unambiguous and there is no exception stated for those persons in privity of contract with the owner or transporter of the swine. We find that the trial court erred in reading into the statute such an exception. That purchasers of swine have a remedy in contract does not necessarily require that they be excluded from protection under this statute. The statute was obviously adopted to insure that hog dealers and owners take care to prevent the spread of contagious or infectious diseases in their swine. Its design is to encourage, through the threat of sanction, vigilance against disease by owners and others in control and also to provide a remedy to persons injured when an owner or person in control does not take reasonable means to prevent the spread of such diseases. The imposition of liability has a twofold purpose to spur compliance with the

requirements and to provide a remedy for persons injured through lack of compliance. As such, the logical interpretation of the statute would be to read it broadly, not narrowly, so as to support the ends sought by its enactment. Such an interpretation would include those in privity of contract with a seller of swine under the terms "person or persons who may have suffered loss on account thereof." It can thus be seen that both the purposes of the statutory section and its plain language argue against any such exception as was created by the trial court. We hold that the trial court erred in dismissing that count of plaintiffs' complaint which sought recovery under the statutory section.

As we have specified herein, the decision of the Circuit Court of Bureau County is reversed in part and affirmed in part, and remanded for further proceedings, consistent with the conclusions expressed in this opinion.

Reversed in part and affirmed in part and remanded.

STENGEL and BARRY, JJ., concur.